UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**TAMMI L. LEE**,                           Case Number 4:12 CV 2713

        Plaintiff,                     Magistrate Judge James R. Knepp, II

v.                                          MEMORANDUM OPINION AND
                                            ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

        Defendant.

## INTRODUCTION

Plaintiff Tammi L. Lee seeks judicial review of the Defendant Commissioner of Social Security's decision to deny social security income benefits (SSI). The district court has jurisdiction over this case under 42 U.S.C. § 1383(c)(3). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 19). For the reasons given below, the Court affirms in part and remands in part the Commissioner's decision denying benefits.

## PROCEDURAL HISTORY

On July 28, 2010, Plaintiff filed an application for SSI claiming she was disabled due to bipolar disorder, depression, and problems with her left foot. (Tr. 11, 81). Her claim was denied initially and on reconsideration. (Tr. 11, 81, 94). At Plaintiff's request, a hearing was held before an administrative law judge (ALJ). (Tr. 11, 59). Plaintiff, represented by counsel, and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 8-22). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 416.1455, 416.1481. On October 29, 2012, Plaintiff filed the instant case. (Doc. 1).

1

**FACTUAL BACKGROUND**

*Plaintiff's Vocational and Personal Background*

Born December 29, 1981, Plaintiff was 30 years old on the date of the ALJ hearing. (Tr. 29). Plaintiff had an eighth-grade education and provided conflicting evidence as to whether she attended special education classes. (Tr. 29, 41, 156). She was married at age seventeen but separated a year later. (Tr. 460). At the time of the hearing, she lived with her boyfriend and two children. (Tr. 30, 174). Plaintiff had no past relevant work experience. (Tr. 17).

With respect to daily activities, Plaintiff testified she slept all day and would lay awake at night watching television. (Tr. 34). She took care of her children and dog and maintained her personal care. (Tr. 175-76). She testified her boyfriend paid the bills, grocery shopped, and cooked. (Tr. 34-35). However, the record contains evidence that Plaintiff paid bills, completed "complicated" house chores, managed her medical care, drove, and used public transportation. (Tr. 176-77, 392, 466).

In a counseling session, she stated she enjoyed going to the bar and playing billiards; however, at the ALJ hearing, she testified she had not been to a bar since she was sixteen. (Tr. 36, 462). Plaintiff enjoyed go-carts and four-wheelers but not mini-bikes. (Tr. 36). She said she tried to stay in her house to avoid losing her temper, as she had problems avoiding confrontation and getting along with others. (Tr. 41, 178).

*Medical Impairments*

Since 2005, James E. Prommersberger, D.P.M., operated on Plaintiff's feet and legs a total of eight times. (Tr. 233, 257, 261, 265, 272, 276, 500, 502). On May 26, 2006, Daniel M. Ebert, M.D., performed surgery on Plaintiff's right hand to address a mass that appeared after she smashed the windows out of a car. (Tr. 268). Additionally, on November 20, 2009, Earnest

Perry, M.D., performed an umbilical hernia repair. (Tr. 283-84). After each surgery, Plaintiff was said to be doing well and discharged with instructions for postoperative care.

Plaintiff made several trips to the Northside Medical Center (NMC) Emergency Room (ER) between December 5, 2008 and May 4, 2010. Generally, she complained of ankle or abdominal pain, or toothaches. (Tr. 286-89, 306-08, 314-21, 323-29, 343-49, 351-57, 361-67). After each visit, Plaintiff was advised to follow up with a doctor and discharged. (Tr. 291-92, 310-11, 319-20, 329-30, 348-49, 356-57, 366-67).

On May 4, 2010, Plaintiff went to the NMC ER with complaints of right middle finger pain and edema caused by slamming her hand during an argument. (Tr. 379-83). She was diagnosed with a hand/finger injury and discharged. (Tr. 384-85).

On April 21, 2010, Plaintiff went to the NMC ER with complaints of knee and neck pain caused by a fall from a four-wheeler or mini-bike. (Tr. 369-72). An x-ray of Plaintiff's knee was unremarkable. (Tr. 377). She was diagnosed with lower-limb contusion and neck strain and discharged. (Tr. 373-75).

Plaintiff began treatment with Michael Shultz, M.D., on January 21, 2009. (Tr. 418). Generally, Dr. Shultz treated Plaintiff for stomach pain, insomnia, and headaches. (Tr. 400, 408, 410, 413, 414). He diagnosed gastroenteritis, peptic ulcer disease (PUD), insomnia, umbilical hernia, and headaches. (Tr. 401, 409, 411). He prescribed carafate, pepcid, percocet, and trazodone and directed her to watch her diet. (Tr. 401, 412, 415).

On March 1, 2010, Dr. Shultz filled out paper work for Plaintiff to have a dental procedure. (Tr. 404). He indicated she had periodontal disease and needed a tooth extraction. (Tr. 405). Dr. Shultz reported Plaintiff had a history of panic attacks but cleared her for the procedure. (Tr. 405).

In July 2010, Plaintiff saw Dr. Shultz and complained of migraines and pain from a twisted left ankle. (Tr. 398-99). Dr. Shultz' ankle examination was unremarkable. (Tr. 399). He diagnosed migraine headaches and a sprained ankle then prescribed periactin, zoloft, a multiple vitamin, vitamin D, percocet, and an ankle brace. (Tr. 399). On August 16, 2010, Dr. Shultz diagnosed a left ankle/foot injury after he noticed a bone chip in Plaintiff's x-rays. (Tr. 396-97).

### Mental Impairments

In early November 2008, Plaintiff started treatment with psychiatrist Krishna Devulapalli, M.D., and therapist Jim McGaha, M.Ed., LPCC, at Churchill Counseling Services (Churchill) for bipolar disorder, depression, and anxiety. (Tr. 252-53, 460-63). Plaintiff had a history of overdosing, slitting her wrists, suicide attempts, and psychiatric hospitalizations, but denied any alcohol or drug problems. (Tr. 252, 460, 463). In the past, she had been raped and physically abused by her stepdad and former boyfriends. (Tr. 252, 452, 462, 466).

At intake on November 5, 2008, Plaintiff complained of extreme mood swings and stated she had been off her medication for over a year. (Tr. 458). Therapist McGaha noted Plaintiff was cooperative; orientated to time, place, and person; had intact memory; and a relevant and coherent thought process. (Tr. 461). Her mood and affect were anxious and irritable, she had sleeping and behavioral disturbances, somewhat limited judgment and insight, and exhibited suicidal and homicidal risk factors. (Tr. 462). She had poor self-esteem, a poor self-concept, and a poor support system but was physically healthy and had average abilities, aptitudes, and skills. (Tr. 462).

Plaintiff and Therapist McGaha created an individualized service plan with goals to control anger, develop impulse control, develop coping skills, and refrain from aggressive and violent behavior. (Tr. 459). He referred Plaintiff to Dr. Devalupalli in order to get her back on

4

medication. (Tr. 458). Therapist McGaha diagnosed bipolar disorder, type II and assigned a global assessment of functioning (GAF) score of 45.[1] (Tr. 463).

On November 6, 2008, Plaintiff told Dr. Devulapalli she suffered adverse side effects on her previous medication regimen and had discontinued it over year ago. (Tr. 252). She complained of crying spells, mood swings, impulsive and angry behaviors, panic-related symptoms, difficulty sleeping, and decreased appetite. (Tr. 252). Dr. Devulapalli reported Plaintiff was casually groomed and dressed, relatively cooperative in her session, and had clear, coherent speech. (Tr. 252). Her mood and affect appeared labile, she denied suicidal ideation, did not express delusions or hallucinations, had limited insight and judgment, and had "at least average intellectual functioning given the vocabulary and fund of knowledge." (Tr. 252). Dr. Devulapalli assigned a GAF of 45[2] and diagnosed bipolar disorder, type II, history of posttraumatic stress disorder (PTSD), and problems with maintaining a support group and social functioning. (Tr. 253). She prescribed medication and recommended Plaintiff continue individual counseling with Therapist McGaha. (Tr. 253).

Throughout her counseling sessions, Plaintiff's mood was consistently sad/depressed, mad/angry, anxious, and impulsive. (Tr. 434, 436, 439, 441, 449-50, 452, 453, 458, 480, 482). Therapist McGaha and Plaintiff regularly discussed Plaintiff's anger-driven behavior and outbursts. (Tr. 434, 435, 439, 441, 447, 453, 455, 485, 489). Plaintiff said her anger adversely affected her work performance, relationships with supervisors and customers, and ability to keep

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 41-50 reflects serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). *Id.* at 34.
2. *DSM-IV-TR*, *supra* note 1.

a job. (Tr. 392, 441, 447, 449). Her anger also negatively impacted her relationship with her children and live-in boyfriend. (Tr. 392, 434-36). For example, on July 7, 2010, Plaintiff stated, "I will kill my boyfriend if he leaves me. I am also going to kill this . . . down the street." (Tr. 439). On May 4, 2011, Plaintiff told Therapist McGaha she planned to harm a woman who had "mess[ed]" with her sister's husband. (Tr. 485).

On November 7, 2009, Plaintiff saw Therapist McGaha for an individualized service plan review. (Tr. 444). She had made moderate progress toward her goals, was physically healthy, and had average abilities. (Tr. 444). However, at a later review on October 7, 2010, McGaha noted Plaintiff had made only minimal progress toward her goals, although she remained physically healthy with average abilities. (Tr. 433).

For a brief period of time in summer 2011, Plaintiff's mood stabilized on medication. (Tr. 482, 483). However, this improvement faded around the time Plaintiff discontinued her medication. (Tr. 481). On September 16, 2011, Therapist McGaha noted Plaintiff had experienced a drastic loss in weight, had recently been in a fight, and possessed Agent Orange. (Tr. 480). At that time, McGaha suggested Plaintiff be hospitalized for depression. (Tr. 480).

Dr. Devulapalli generally addressed Plaintiff's anger, anxiety, and depression; and consistently adjusted and monitored her medication regimen. (Tr. 243-53, 437, 481, 484, 486-87, 492). On July 23, 2009, Plaintiff was "extremely upset" because Dr. Devulapalli was late to an appointment. (Tr. 248). Dr. Devulapalli stated Plaintiff "even walked out of the office but subsequently returned." (Tr. 248). Otherwise, Dr. Devulapalli regularly reported Plaintiff was cooperative during their sessions. (Tr. 244-45, 251, 437, 481, 484, 486, 492-94). She also frequently indicated Plaintiff appeared irritable, angry, and anxious, with a "labile" mood. (Tr. 247-251, 437, 481, 492-94). Plaintiff consistently denied depression or suicidal ideation. (Tr.

244-45, 247-48, 250, 437, 481, 484, 493). However, on September 27, 2011, Dr. Devulapalli reported Plaintiff had suicidal thoughts but no suicidal plans. (Tr. 494). Dr. Devulapalli reported several noncompliance issues, generally because Plaintiff felt her medicine did not work and ceased taking it or because she thought a higher dose would be more effective. (Tr. 246-48, 481).

***Opinion Evidence***

On September 8, 2010, Dr. Prommersberger diagnosed Plaintiff with a left foot injury. (Tr. 422). He indicated Plaintiff was compliant with treatment but was unable to ambulate on her left foot for longer than two hours. (Tr. 423).

On May 25, 2012, Dr. Prommersberger opined Plaintiff could stand or walk for less than two hours, sit at least six hours, and stand at one time for a maximum of fifteen to 30 minutes in an eight-hour workday. (Tr. 506). He described her pain as moderate. (Tr. 507).

On February 23, 2011, Dr. Devulapalli completed a mental status evaluation for the Bureau of Disability Determination (BDD). (Tr. 472-74). She reported Plaintiff was fairly well groomed with irritable speech, angry affect and mood, impulsive signs, symptoms of anxiety, no thinking disorders, and alert orientation. (Tr. 472-73). She diagnosed bipolar disorder and PTSD. (Tr. 473).

On May 17, 2012, Dr. Devulapalli completed an assessment of Plaintiff's ability to do work-related activities. (Tr. 496). She reported Plaintiff had marked limitation in her abilities to relate to other people and sustain a routine without special supervision. (Tr. 496). Plaintiff was moderately restricted in her abilities to perform activities of daily living and personal maintenance, maintain concentration and attention for extended periods of time, perform activities within a schedule, maintain regular attendance, and be punctual. (Tr. 496). Dr.

Devulapalli opined Plaintiff would miss work about three times a month due to her impairments. (Tr. 497).

On September 3, 2010, Therapist McGaha completed a mental status questionnaire for the BDD. (Tr. 388). He reported Plaintiff's appearance was disheveled, her conversation was full of profanity and threats toward perceived adversaries, and her mood and affect were irritable and angry. (Tr. 388). She was upset over not getting help from her parents and a custody battle with her ex-husband. (Tr. 388). She had poor long- and short-term memory, inability to think abstractly, poor insight and judgment, and borderline intelligence. (Tr. 388-89). Therapist McGaha described Plaintiff as "quite explosive and violent" and noted Plaintiff's threats to have a "shoot out" with her neighbor, whom Plaintiff believed reported her to the local children services board. (Tr. 388).

Therapist McGaha indicated Plaintiff was incapable of managing any benefits that may be due and had poor ability to remember, understand, follow directions, and maintain attention. (Tr. 389). She had an inability to sustain concentration, persist at tasks, and complete tasks in a timely fashion. (Tr. 389). She had poor ability to interact appropriately socially and became very agitated when tasks changed. (Tr. 389). In a work setting, she would initially become irritable, angry, and very agitated then she would become aggressive and threating and possibly violent. (Tr. 389). She had a poor stress tolerance and would tend to become suicidal under high stress. (Tr. 391).

On October 29, 2010, Kenneth Gruenfeld, Psy.D., conducted a psychological evaluation. (Tr. 465). Plaintiff's appearance was fair; she was cooperative; and she had good task motivation, task persistence, attention, concentration, and response to direction. (Tr. 465-66). Her speech was normal in tone, rate, and volume; she had logical and topical conversation; fair

eye contact; appropriate mood and affect; and she denied current suicidal ideation. (Tr. 467). Plaintiff's mental content was normal and she was able to recall three out of three simple objects after fifteen minutes, complete a serial seven subtraction down to two, recall five digits forward and five digits backward, recall past history events with an average amount of detail, and had good insight and judgment. (Tr. 467). Dr. Gruenfeld assigned Plaintiff a GAF of 55.[3] (Tr. 468-69).

Dr. Gruenfeld indicated Plaintiff could manage her activities of daily living except during serious depressive episodes. (Tr. 468). He concluded Plaintiff had mild impairment in her ability to relate to others, no impairment with respect to understanding and following directions, and moderate impairment in her abilities to maintain attention, perform routine tasks, and withstand the stress and pressures associated with day-to-day work activity. (Tr. 469).

### ALJ Decision

On June 19, 2012, the ALJ determined Plaintiff had the following severe impairments; right foot plantar fasciitis status/post-surgical repair, left foot neuroma status/post-surgical repair, bipolar disorder, and anxiety disorder. (Tr. 13). The ALJ concluded her impairments did not meet or medically equal a listed impairment. (Tr. 13-14).

The ALJ determined Plaintiff had the residual functional capacity (RFC) to perform sedentary work except she could not use foot controls and was limited to routine work that did not involve arbitration, confrontation, or negotiation. (Tr. 14). She could not direct the work of others, be responsible for the safety or welfare of others, perform work that required strict production quotas, or perform piece-rate work or assembly-line work. (Tr. 14). She could only

---

3. A GAF score of 51-60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *DSM-IV-TR,* at 34.

have superficial, occasional interaction with others. (Tr. 14). Based on VE testimony, the ALJ concluded Plaintiff could perform work as a small products assembler. (Tr. 18).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence, or indeed a preponderance of the evidence, supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a)(1). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five–step evaluation process – found at 20 C.F.R. § 416.920 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can she perform past relevant work?

5. Can the claimant do any other work considering her RFC, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only found disabled if she satisfies each element of the analysis, including inability to do other work, and meets the durational requirements. 20 C.F.R. §§ 416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues: 1) the ALJ's step-three analysis is not supported by substantial evidence; 2) the ALJ failed to provide good reasons for discrediting the opinion of treating physician, Dr. Devulapalli; and 3) the ALJ did not satisfy her burden at step five to show work exits in "significant numbers" in the national economy which Plaintiff could perform. (Doc. 15, at 12). Each argument is addressed below.

### *The ALJ's Step-Three Finding*

Plaintiff claims the ALJ erred at step three of the sequential analysis by failing to consider whether her severe physical impairments met or medically equaled listing 1.02. (Doc. 15, at 17).

11

The listing of impairments is used at the third step of the disability determination process to determine whether a claimant is disabled. *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 414 (6th Cir. 2011). If a claimant meets the requirements of a listed impairment, then the claimant is considered disabled. 20 C.F.R. § 416.926(a). If not, the sequential evaluation process continues and the ALJ must determine whether a claimant's impairment or combination of impairments is the "medical equivalence" of a listed impairment. *Id*. An impairment is equivalent to a listed impairment "if it is at least equal in severity and duration to the criteria of any listed impairment." *Id*. An ALJ must compare medical evidence with the requirements for listed impairments at step three. *Id.*; *May v. Astrue*, 2011 WL 3490186, at *7 (N.D. Ohio 2011).

At step two, the ALJ determined Plaintiff had "more than strains/sprains" and classified Plaintiff's foot impairments as severe because "they pose[d] more than minimal limitations upon the [Plaintiff's] ability to perform work-related activity." (Tr. 13). At step three, the ALJ summarily stated, "[t]he [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1[.]" (Tr. 13). In his step-three analysis, the ALJ did not reference Plaintiff's physical impairments. (Tr. 13-14). Rather, he only considered whether Plaintiff's mental impairments, considered singly and in combination, met or medically equaled the criteria of listings 12.04 or 12.06. (Tr. 13-14).

There is no "heightened articulation standard" in considering the listing of impairments; rather, the court considers whether substantial evidence supports the ALJ's findings. *Snoke v. Astrue*, 2012 WL 568986, at *6 (S.D. Ohio 2012) (quoting *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir. 2006)). However, the court must find an ALJ's decision contains "sufficient analysis to allow for meaningful judicial review of the listing impairment decision." *Snoke*, 2012

WL 568986, at *6 (citing *Reynolds*, 424 Fed. App'x at 415-16); *see also May*, 2011 WL 3490186, at *7 ("In order to conduct a meaningful review, the ALJ's written decision must make sufficiently clear the reasons for his decision."). The court may look to the ALJ's decision in its entirety to justify the ALJ's step-three analysis. *Snoke*, 2012 WL 568986, at *6 (citing *Bledsoe*, 165 Fed. App'x at 411).

Where, as here, the ALJ failed to compare a severe impairment to the listings, this District has remanded for further analysis. *See, e.g., May*, 2011 WL 3490186, at *10 ("The ALJ was required to evaluate [the evidence], compare it to Section 1.00 of the Listing, and give an explanation, in order to facilitate meaningful review. Otherwise, it is impossible to say that the ALJ's decision at step three was supported by substantial evidence."); *Hunter v. Astrue*, 2011 WL 6440762, at *4 (N.D. Ohio 2011) ("Because the ALJ failed to conduct a meaningful review of the record evidence of Plaintiff's severe back impairment in relation to the relevant Listed Impairment, the Court . . . remands for a more thorough step three determination."); *Marok v. Astrue*, 2010 WL 2294056, at *4 (N.D. Ohio 2010) (remanding where it was impossible for the court "to ascertain whether the ALJ considered criteria such as the disabling effects of obesity" on the claimant's condition because the ALJ only summarily cited a medical expert's opinion at step three); *Keyes v. Astrue*, 2012 WL 832576, at *5-6 (N.D. Ohio 2012) (remanding for the ALJ's failure to consider whether the claimant's mental and physical impairments, alone or in combination, met or equaled one of the listed impairments at step three); *Raymond v. Comm'r of Soc. Sec.* 2012 WL 2872152, at *4, n.50, 51 (N.D. Ohio 2012) (collecting cases where this District reversed because the "ALJs made unaffirmable cursory or summary declarations that a claimant did not meet or equal a listing without evidence to that effect from a medical expert or without an extensive, reviewable discussion of the record.").

Here, the Commissioner argues, "the ALJ was not require[d] to evaluate the case under Listing 1.02 . . . because the record contained no evidence showing an inability to ambulate." (Doc. 10, at 13). Therefore, continues the Commissioner, the ALJ's determination is supported by substantial evidence. (Doc. 10, at 14).

Without so stating, the Commissioner essentially raises a *Rabbers* argument. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). In *Rabbers*, the ALJ evaluated the claimant's bipolar disorder under listing 12.04, but failed to provide a complete analysis by leaving out discussion of the listing's paragraph "B" criteria. *Id.* Although the ALJ's omission at step three was error, the Sixth Circuit found it harmless because there was insufficient evidence in the record to show the claimant met any of the paragraph "B" criteria. *Id.* at 658-61. Therefore, even if the ALJ had analyzed the paragraph "B" criteria, his step-three conclusion would not have changed. *Id.* However, the court cautioned other courts engaged in a step-three harmless error review against similarly affirming if the record contains "conflicting or inconclusive evidence relating to the [listing]." *Id.* at 657-58.

This case is unlike *Rabbers* because the record contains evidence which makes it plausible that Plaintiff could have satisfied listing 1.02. To this end, listing 1.02 addresses major dysfunction of a joint (i.e., hip, knee, or ankle) characterized by "gross anatomical deformity" and "chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s) and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)" resulting in the "inability to ambulate effectively." 20 C.F.R. pt. 404, subpt. P, App.1: Listing 1.02. One has the inability to ambulate effectively if he or she has the inability to sustain a reasonable walking pace over a

14

sufficient distance or to carry out activities of daily living, such as the inability to walk a block at a reasonable pace. 20 C.F.R. pt. 404, subpt. P, App.1: Listing 1.00(2)(b)(2).

Here, the ALJ somewhat developed the medical record and considered Plaintiff's physical limitations as part of his RFC determination. (Tr. 15-16). However, his discussion of the record contains conflicting and inconclusive evidence of Plaintiff's ability to ambulate effectively, and thus presents the very scenario *Rabbers* cautioned against.

Indeed, the ALJ addressed Plaintiff's extensive surgical history, use of an ankle brace, and inability to stand or walk for more than two hours. (Tr. 15-16). With respect to activities of daily living, the ALJ indicated Plaintiff did not leave the house or do any shopping and spent her days on the sofa or porch. (Tr. 15). Moreover, the ALJ's RFC determination limited Plaintiff to sedentary work and restricted her from using foot controls. (Tr. 14). But, the ALJ later stated that Plaintiff cooks, cleans, shops, rides a mini-bike, drives, and uses public transportation. (Tr. 17). Accordingly, the evidence in this case is conflicting and inconclusive, and does not "clearly" suggest the ALJ's step-three error was harmless. Therefore, *Rabbers* is inapplicable to the case at hand. *See*, *Rabbers*, 582 F.3d at 658.

Conversely, this case is factually analogous to *Waller v. Astrue*, 2012 WL 6771844 (N.D. Ohio 2012), *report and recommendation adopted*, 2013 WL 57046 (N.D. Ohio 2013).[4] In *Waller*, the ALJ determined the claimant had severe physical and mental impairments at step two, then, at step three, summarily stated the claimant "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments". *Id*., at *3. Like here, the ALJ's step-three analysis neglected to mention the claimant's severe physical

---

4. Plaintiff likens the ALJ's analysis at step three to that in *Reynolds v. Comm'r of Soc. Sec.,* 424 Fed. App'x 411, 415-16 (6th Cir. 2011). (Doc. 15, at 17). However, *Reynolds* is slightly different from the case at bar. In *Reynolds*, the ALJ expressly intended to analyze listing 1.02, but never did. *Id*. Here, the ALJ never made such a statement of intention to consider listing 1.00. *Id*.

impairment, but instead only addressed listing 12.00 (affective mental disorders). *Id*. "Tellingly," wrote the Magistrate Judge, "the Commissioner does not argue that the ALJ adequately explained his Step Three determination as it relates to [claimant's] physical impairments." *Id*. Rather, as was briefed in the case *sub judice*, the Commissioner asserts the claimant failed to identify any evidence that would support finding she met the asserted listing. *Id*.; (Doc. 16, at 10). In *Waller*, the court remanded because the ALJ, despite determining the claimant suffered from severe physical impairments, provided "no discussion whatsoever whether [those] physical impairments, either singularly or in combination, met or equaled the listings." *Id*.; *relying on Hunter v. Astrue*, 2011 WL 6440762 (N.D. Ohio 2011) (remanding for step-three error even though the ALJ had adequately summarized the medical record because the ALJ did not apply the medical evidence to the listings at step three).

Because the ALJ failed to provide this Court with a meaningful opportunity to review his step-three determination, and because the record does not indicate this error was harmless under *Rabbers* or its progeny, the undersigned remands this case for further analysis of Plaintiff's physical impairments at step three.

***Treating Physician Rule***

Plaintiff argues the ALJ failed to provide "good reasons" for discounting the opinion of treating psychiatrist Dr. Devulapalli. (Doc. 15, at 13).

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers*, 486 F.3d at 242 (6th Cir. 2007); *see also* Social Security Ruling (SSR) 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be

obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is [consistent] with other substantial evidence in the case record." *Id*. When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. *Rabbers*, 582 F.3d at 660 (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id*.

Of importance, the ALJ must give "good reasons" for the assigned weight. *Id*. "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004). A failure to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id*. (quoting *Rogers*, 486 F.3d at 243).

Here, the ALJ rejected Dr. Devulapalli's opinions that Plaintiff would need to miss three workdays per month, her condition would increase under stress, and she would be markedly limited in her abilities to relate to others and sustain a routine without special supervision. (Tr. 16-17). As support, the ALJ pointed to Plaintiff's activities of daily living; evidence of

noncompliance; effectiveness of medication; abilities to raise children, schedule and attend appointments, fill prescriptions, and ask for adjustments in medication; and Dr. Devulapalli's use of "the problematic check-sheet to make her assessment". (Tr. 16-17). The ALJ agreed with Dr. Devulapalli's determination that Plaintiff was moderately limited in most areas of functioning. (Tr. 17).

The ALJ provided the necessary "good reasons" to afford parts of Dr. Devulapalli's opinion less than controlling weight by discussing Plaintiff's course of treatment and the consistency of Dr. Devulapalli's opinion. To this end, the ALJ pointed to the fact that Plaintiff never decompensated under the stress of raising her children, which she claimed was her biggest stressor. (Tr. 17). The ALJ also pointed to Plaintiff's ability to care for herself and her children independently, and to address her medical needs as they arose. (Tr. 17). Finally, the ALJ cited to Plaintiff's wide-ranging activities of daily living and reports of non-compliance. (Tr. 16).

These assertions are supported by substantial evidence from the record. For instance, the record contains evidence that Plaintiff cared for her children and dog, watched television, paid bills, conducted complicated house chores, managed medical issues, drove, and used public transportation. (Tr. 176-77, 392, 466). Moreover, there is some evidence to show Plaintiff went to bars to play billiards and rode four-wheelers or mini-bikes. (Tr. 36, 369-72, 462). Plaintiff's extensive medical history provides little indication that she was late to or did not show up for surgeries or pre-scheduled doctor appointments. There is some evidence to show medication alleviated her symptoms when Plaintiff was compliant. (Tr. 444, 468, 482-83, 487, 492). However, when she was noncompliant, her symptoms intensified. (Tr. 246, 247, 252, 458, 481). Finally, the record does not suggest Plaintiff had decompensated for an extended period of time.

Furthermore, the ALJ determined Dr. Devulapalli's check-sheet assessment was problematic, which is an argument against the supportability of the opinion. In her brief, Plaintiff relies on *Coy v. Astrue* to argue the ALJ cannot categorically ignore a physician's checkmark-style report. 2012 WL 5497850 (N.D. Ohio 2012); (Docs. 15, at 14-15; 17, at 1-2). However, *Coy* is distinguishable from the case *sub judice*. In *Coy*, the court held the Commissioner could not make a post-hoc argument against the format of a doctor's report. *Coy*, 2012 WL 5497850, at *8. Here, however, the ALJ expressly cited to the format of Dr. Devulapalli's report in his opinion.

What is more, the ALJ may consider the format of a doctor's opinion as part of his determination. Indeed, "courts within the Sixth Circuit have cast doubt on the usefulness of such 'checkmark' or 'multiple choice' forms when unaccompanied by explanation or unsupported by physician's notes." *Doyle v. Comm'r of Soc. Sec.*, 2012 WL 4829434, at *9 (E.D. Tenn. 2012) (citing *Boley v. Astrue*, 2012 WL 680393, at *18 (E.D. Mich. 2012) and *Ahee v. Comm'r of Soc. Sec.*, 2008 WL 4377652, at *4 (E.D. Mich. 2008)), *report and recommendation adopted*, 2012 WL 4829213 (E.D. Tenn. 2012); *see also*, *Hyson v. Comm'r of Soc. Sec.*, 2013 WL 2456378, at *13 (N.D. Ohio 2013) (collecting cases that held the ALJ does not err by discounting a physician's opinion which used a checkbox form unaccompanied by explanation of her conclusions).

Here, substantial evidence supports the ALJ's decision to discredit the supportability of Dr. Devulapalli's checkbox opinion. The form in question is a two-page, "checkbox" style form, wherein Dr. Devulapalli provided minimal written explanation for her opinions. (Tr. 496-98). Although she clarified that a psychological evaluation was not obtained because it was

unnecessary, Dr. Devulapalli declined to provide any meaningful explanation for her conclusions despite being provided with blank space. (Tr. 497).

In sum, the ALJ provided the necessary "good reasons" for rejecting portions of Dr. Devulapalli's opinion; therefore, her conclusion is supported by substantial evidence. *See* 20 C.F.R. § 416.927(d)(2).

### Step-Five Determination

Plaintiff argues the Commissioner failed to meet her burden at step five because the ALJ did not resolve whether 500 jobs regionally and 29,000 nationally constituted "significant numbers" of available work. (Doc. 15, at 19).

At step five, the Commissioner has the burden to show, considering a claimant's age, education, and work experience, that jobs exist in significant numbers in the national economy which claimant can perform. 20 C.F.R. § 416.969; *Hall v. Bowen*, 837 F.2d 272, 272 (6th Cir. 1988). Under the Regulations, "work exists in the national economy when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions of the country." 20 C.F.R. § 416.966(a). There is no bright-line boundary separating a "significant number" from an insignificant numbers of jobs. *Hall*, 837 F.2d at 275 (6th Cir.1988).

A reviewing court should "consider many criteria in determining whether work exists in significant numbers" including "the level of the claimant's disability[,] the reliability of the [VE's] testimony[,] the reliability of the claimant's testimony[,] the distance claimant is capable of travelling to engage in the assigned work[,] the isolated nature of the jobs[,] the types and availability of such work, and so on." *Id*. Here, based on Plaintiff's age, education, work experience, and RFC, the ALJ determined there were 29,000 jobs nationally and 500 jobs regionally which Plaintiff could perform. (Tr. 18).

Plaintiff relies on *Ruffin v. Comm'r* to argue it was error for the ALJ to make a step-five determination without "any sort of analysis of the *Hall* factors[]" in the record. 2011 WL 4537905, at *2-3 (N.D. Ohio 2011); (Doc. 15, at 21). In response, the Commissioner directs the undersigned to *Harmon v. Apfel*, which described the *Hall* factors as "suggestions only". 168 F.3d 289, 292 (6th Cir. 1999) (quoting *Hall*, 837 F.2d at 275); (Doc. 16, at 12).

Irrespective of whether a discussion of the *Hall* factors is required to permit meaningful judicial review, the requirement has been satisfied. First, in compliance with *Hall*, the reliability of the VE's testimony was addressed. Indeed, the VE testified she arrived at the relevant number of jobs using the Department of Labor, U.S. Publishing and her personal and professional experience. (Tr. 51). Furthermore, the types and availability of work were considered. To this end, the VE clarified that the number of regional and national jobs included multiple job titles. (Tr. 52-53). Moreover, the ALJ provided a credibility determination, to which Plaintiff did not object. (Tr. 15-18). Therefore, whether or not they needed to be, the *Hall* factors have been sufficiently addressed in the record.

Furthermore, *Hall* generally directs the Court to exercise "common sense" when determining whether 500 regional and 29,000 national jobs constitute a "significant number" of jobs. *See*, *Hall*, 837 F.2d at 275 ("The decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation."). After viewing the evidence, the undersigned finds that several of the *Hall* factors favor the ALJ's determination. Moreover, Plaintiff has not alleged that the ALJ posed an inadequate or misleading hypothetical to the VE, which would have tainted her opinion, nor has she argued she cannot physically get to any of the suggested jobs. Rather, she essentially argues the number of jobs is insufficient as a matter of law, a position with which the undersigned does

not agree. Accordingly, the Court finds the ALJ's decision at step five is supported by substantial evidence.

CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the Commissioner's determinations regarding step five and the weight afforded to Dr. Devulapalli are affirmed. However, the Court finds the ALJ's decision unsupported by substantial evidence to the extent the Commissioner failed to compare Plaintiff's foot impairment to the relevant listing at step three. Accordingly, this matter is remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

IT IS SO ORDERED.


 s/James R. Knepp II
United States Magistrate Judge